UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
ROBERT SIMPSON, individually and as successor-in- :
interest to Simpson Master Investments Limited, :
:
                            Plaintiff, :      Case No.
:
     - against - :      **COMPLAINT**
:
:
MELISSA GAYHEART as trustee of MSJJ :
RETIREMENT GROUP TRUST, :
:
                            Defendant. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff Robert Simpson, individually and as successor-in-interest to Simpson Master Investments Limited, by his attorneys Kleinberg, Kaplan, Wolff & Cohen, P.C., as and for his complaint against defendant Melissa Gayheart as trustee of MSJJ Retirement Group Trust, alleges as follows:

## SUMMARY OF THE ACTION

1. This action arises from the defendant's refusal to honor its straightforward, contractual obligations under two separate but related swap agreements. The defendant, a sophisticated investment trust, by its representatives, induced the plaintiff, Mr. Simpson, to enter into these derivatives contracts in order to obtain access to immediate and substantial funding – millions of dollars – and used Mr. Simpson's capital to trade for defendant's own account and benefit. Defendant structured these financing vehicles and profited from this arrangement, agreeing, in exchange, and under each of the swap agreements, to make variable payments to Mr. Simpson based upon defendant's trading results. But defendant failed to do so, in breach of its obligations. Defendant owes Mr. Simpson no less than $3.9 million – $600,000 under one swap agreement and at least approximately $3.3 million under the second swap agreement – plus

contractual interest, attorneys' fees and collection costs. Defendant should be held accountable for its inexcusable breaches of contract and should be adjudged liable for the millions of dollars owed to Mr. Simpson under the two bargained-for swap agreements.

## THE PARTIES

2. Plaintiff Robert Simpson is an individual residing and domiciled in the State of New York, and his sole business address is located at 30 East 33rd Street, 6th Floor, New York, New York 10016; and Mr. Simpson is a citizen of the State of New York.

3. Mr. Simpson is the successor-in-interest to Simpson Master Investments Limited ("SMIL"), a Cayman Islands exempted company and a private investment company, and/or is the assignee with respect to SMIL's swap-related rights. Simpson Capital Management, Inc., which has its principal place of business in Manhattan, served as investment manager to SMIL in connection with the two swap trades which are the subject of this proceeding.

4. Upon information and belief, defendant Melissa Gayheart, the trustee of MSJJ Retirement Group Trust, a trust qualified under I.R.S. Revenue Ruling 81-100, is an individual and attorney residing and domiciled in the State of Kentucky, and her sole business address is located at 2201 Regency Road, Suite 704, Lexington, Kentucky 40503; and Ms. Gayheart as trustee of MSJJ Retirement Group Trust ("MSJJ Trust") is a citizen of the State of Kentucky.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over MSJJ Trust and this matter pursuant to 28 U.S.C. § 1332(a)(1) because this action is between citizens of different states and complete diversity exists, and because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

6. Venue is proper in this judicial district pursuant to 28 U.S.C. 1391(b)(2) and (3) since a substantial part of the events giving rise to this action occurred in this district, and since

Mr. Simpson and his predecessor-in-interest, SMIL, and MSJJ Trust, in writing, submitted to the exclusive jurisdiction of the United States District Court located in the Borough of Manhattan and waived any objections to the laying of venue in the Borough of Manhattan, agreeing specifically that "[w]ith respect to any suit, action or proceedings relating to any dispute arising out of or in connection with this Agreement ("Proceedings"), each party: (i) irrevocably submits to the exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City of the State of New York, and (ii) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party." *See* ISDA 2002 Master Agreement dated as of December 9, 2016, and the Schedule to the 2002 Master Agreement (together, "Master Agreement I"), at 34; ISDA 2002 Master Agreement dated as of December 20, 2017, and the Schedule to the 2002 Master Agreement (together, "Master Agreement II"), at 34.

## FACTUAL ALLEGATIONS

### A. Swap Agreements Generally

7. A swap agreement refers to any contract concerning any swap or derivatives transaction or similar agreement involving, or settled by reference to, one or more measures of economic, financial or pricing risk or value, or any similar transaction or any combination of these transactions.

8. While there are many types of swap agreements, generally a swap is a derivatives contract between two parties to exchange sequences of cash flows for a defined period of time, and/or can serve as a financing vehicle for one of the parties. The parties' swap agreements

simply provide for payments by MSJJ Trust to plaintiff of variable returns within a range of 10 percent to 20 percent, in exchange for MSJJ Trust's use of the premium.

9. Swaps are not exchange-traded instruments. Instead, swaps are customized contracts that are traded between private market participants in the decentralized, over-the-counter market. The 2002 ISDA Master Agreement has become the standard form contract used by most financial institutions, investors and other parties to memorialize their swaps and derivatives transactions. The 2002 ISDA Master Agreement is a standardized agreement created by the International Swaps and Derivatives Association, containing most or all of the parties' agreed-upon terms. While frequently trading parties supplement the 2002 ISDA Master Agreement with schedules and other addenda, the 2002 ISDA Master Agreement allows the parties to negotiate and prepare complex transactions, regarding sophisticated financial products, in a comprehensive and efficient way.

## B. The Parties' Swap Agreements

### i. *The 2016 Swap Agreement*

10. In late 2016, MSJJ Trust sought access to millions of dollars in capital for trading purposes, and requested that SMIL (an entity principally owned and controlled by Mr. Simpson) provide this capital and enter into a swap transaction with MSJJ Trust. On behalf of SMIL, as its director, Mr. Simpson negotiated the transaction with MSJJ Trust's trustee, Ms. Gayheart, and with MSJJ Trust's principal (indirect) beneficiary, Dr. Bernard Tew; and Mr. Simpson did so by telephone and email from Mr. Simpson's business office in Manhattan.

11. Following these negotiations, on or about December 9, 2016, MSJJ Trust and SMIL agreed upon all of the terms and each entered into a "Positive Performance Swap," evidenced by (i) Master Agreement I, and (ii) the Transaction Confirmation and attached annex ("Confirmation I," and together with Master Agreement I, "Swap Agreement I"). MSJJ Trust's

outside counsel Seward & Kissel LLP prepared Swap Agreement I, and Mr. Simpson, on behalf of SMIL, subsequently executed Swap Agreement I from his office in Manhattan.

12. Master Agreement I provides that "this Master Agreement and all Confirmations form a single agreement between the parties" (Master Agreement I, at § 1(c)); and Confirmation I states that "[t]his Confirmation supplements, forms part of, and is subject to, the [M]aster Agreement dated as of December 9, 2016" and that "[a]ll provisions contained in the [Master] Agreement govern this Confirmation except as expressly modified below." Confirmation I, at 1.

13. Under Swap Agreement I, which sets forth all the terms and conditions of the parties' transaction, the parties agreed that "[e]ach party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement." Master Agreement I, at § 2(a)(i).

14. SMIL, also known as "Party B" in Swap Agreement I, for its part agreed to deliver to MSJJ Trust the sum of $3 million (the "Total Premium") in connection with the parties' transaction. Confirmation I, at 2 ("Party B shall pay to Party A the Total Premium into the Reference Account on the Premium Payment Date," defining the Total Premium as "$3,000,000 USD"). SMIL agreed to make this payment on or about December 9, 2016, into "[t]he custody account of MSJJ Retirement Group Trust ... at Central Bank and Trust, Lexington, KY number *****363." Confirmation I, at 1. As a result and as contemplated, MSJJ Trust would use the proceeds from the Total Premium payment in order to trade for its own account and benefit.

15. In return, MSJJ Trust agreed to pay SMIL, by the earlier of December 8, 2017 or an "Early Valuation Date," an amount equal to the Total Premium previously paid by SMIL (the "Premium Repayment Amount"), plus an agreed-upon portion of any returns with respect to MSJJ's investment of the Total Premium.

5

16. Swap Agreement I defines the Premium Repayment Amount, required to be paid by MSJJ Trust, as follows:

> *In respect of the Termination Date, Party A [MSJJ Trust] shall pay Party B [SMIL],*
>
>     (i)    *TP, if $F \leq 0$*
>
>     *or*
>
>     (ii)    *TP, if $F \geq 0$*
>
> *Where:*
>
> *TP = The Total Premium paid hereunder*
>
> *F = The Final Reference Asset Value*

17. In addition to payment of the Premium Repayment Amount, MSJJ agreed to pay SMIL certain equity amounts (the "Equity Amounts") defined as follows:

> *In respect of each Valuation Date, the greater of:*
>
>     (i)    *TP x [(10% X N/360)]*
>
>     *or*
>
>     (ii)    *TP x [(RP% X N/360)]*
>
>     *But not more than:*
>
>     (iii)    *TP x [(20% X N/360)]*
>
> *Where:*
>
>     \* \* \*
>
> *TP = The Total Premium paid hereunder*
>
> *RP = The Total Realized Percentage Return greater than 10% but less than 20%; and*
>
> *N = The number of calendar days in the period on the day following the previous Valuation Date to and including the Valuation Date for the current period.*

Confirmation I, at 2-3 (defining "Valuation Date" as "[t]he last Business Day of each calendar month following the Trade Date and to and including the Termination Date").

18. Under Swap Agreement I, the "[f]ailure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 9(h)(i)(2) or (4) required to be made by it … if such failure is not remedied on or before the first Local Business Day in the case of any such payment … [constitutes] an event of default … with respect to such party." Master Agreement I, at § 5(a)(i).

19. In accordance with Swap Agreement I, "[i]f at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions." Master Agreement I, at § 6(a).

20. If the Early Termination Date results from an Event of Default, the Early Termination Amount will equal "the Close-out Amount … determined by the Non-defaulting Party," and the "Close-out Amount" includes "the economic equivalent of … the payments and deliveries by the parties under Section 2(a)(i) … that would, but for the occurrence of the relevant Early Termination Date, have been required after that date…." Master Agreement I, at § 6(e)(i) and 22-23.

21. An "Early Termination Amount" due in respect of any Early Termination Date "will, together with any amount of interest payable pursuant to Section 9(h)(ii)(2), be payable … on the day on which notice of the amount payable is effective in the case of an Early Termination

Date which is designated or occurs as a result of an Event of Default...." Master Agreement I, at § 6(d)(ii).

### ii. *The 2017 Swap Agreement*

22. By the end of 2017, MSJJ Trust had not made a single monthly equity/profit payment and repeatedly breached Swap Agreement I, prompting MSJJ Trust's representatives, including Mr. Tew, to request that Mr. Simpson, on behalf of SMIL, forbear from enforcing SMIL's rights under Swap Agreement I at that time and afford MSJJ Trust more time to pay SMIL. Mr. Simpson, on behalf of SMIL, agreed to do so, to the limited extent set forth below.

23. In late 2017, to accomplish the foregoing, MSJJ Trust, through Ms. Gayheart and Mr. Tew, negotiated a second, related transaction, this time directly with Mr. Simpson individually, not SMIL, as the counterparty. Mr. Simpson conducted these negotiations by telephone and email from his business office in Manhattan. Following these negotiations, on or about December 20, 2017, MSJJ Trust and Mr. Simpson agreed upon all of the terms and each entered into a second "Positive Performance Swap," evidenced by (i) Master Agreement II, (ii) the Transaction Confirmation ("Confirmation II," and together with Master Agreement II, "Swap Agreement II"). MSJJ Trust's counsel Seward & Kissel LLP prepared Swap Agreement II, and Mr. Simpson thereafter executed Swap Agreement II from his office in Manhattan.

24. The terms of Swap Agreement II are substantially similar to Swap Agreement I: (i) Master Agreement II governs the terms of Confirmation II "except as expressly modified [in Confirmation II]" (Master Agreement II, at § 2(a)(i)); (ii) MSJJ Trust agreed to pay Mr. Simpson, by the earlier of December 21, 2018 or an "Early Valuation Date," the Premium Repayment Amount (i.e., the initial $3 million payment), plus an agreed-upon portion of any returns with respect to MSJJ's investment of the Total Premium, pursuant to the same formulas and definitions set forth in Swap Agreement I (Confirmation II, at 2-3); (iii) the "[f]ailure by the

party to make, when due, any payment under this Agreement ... [is] "an event of default ... with respect to such party" (Master Agreement II, at § 5(a)(i)); (iv) "[i]f at any time an Event of Default with respect to a party ... has occurred and is then continuing, the other party ... may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions" (Master Agreement II, at § 6(a)); (v) the "Early Termination Amount" payable to Mr. Simpson will equal "the economic equivalent of ... the payments and deliveries by the parties under Section 2(a)(i) ... that would, but for the occurrence of the relevant Early Termination Date, have been required after that date...." (Master Agreement II, at §§ 6(e)(i) and 14 ("Close-out Amount" definition)); and (vi) an "Early Termination Amount," together with interest, shall be payable ... "on the day on which notice of the amount payable is effective in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default...." (Master Agreement I, at § 6(d)(ii)).

25. There is a material difference between Swap Agreements I and II. In Swap Agreement II, the parties rolled over the Total Premium from Swap Agreement I to Swap Agreement II and agreed – without otherwise impacting SMIL's rights under Swap Agreement I or in any other respect – that "Party B, in lieu of receiving the full Premium Repayment Amount due it under the Confirmation dated December 9, 2016 [Swap Agreement I] ... directs Party A to retain such Premium Repayment Amount in satisfaction of Party B's obligation to pay the Total Premium in the Reference Account [in connection with Swap Agreement II]." Confirmation II, at 2.

C. **MSJJ Trust's Breach of the Swap Agreements**

26. SMIL and Mr. Simpson timely made the $3 million Premium Payment and otherwise complied with all of their obligations, notice requirements and conditions precedent

9

under Swap Agreements I and II. MSJJ traded and invested the proceeds from the Total Premium payment for its own account and benefit. Having had the unfettered use of SMIL's and Mr. Simpson's capital for more than 20 months, MSJJ Trust still has failed to honor its contractual obligations under the Swap Agreements.

27. MSJJ Trust agreed that "Party A will pay the Party A Equity Amount to Party B on each Cash Settlement Payment Date" which is "5 Business Days after" "[t]he last Business Day of each calendar month following the Trade Date and to and including the Termination Date." Confirmation I and II, at 3-4. MSJJ Trust has breached the Swap Agreements and is in default under the terms of Swap Agreements I and II.

28. In connection with Swap Agreement I, MSJJ Trust was required to pay the Equity Amounts five business days after each calendar month following the December 9, 2016 trade date, through and including the termination date of December 8, 2017. MSJJ Trust failed to do so – breaching Swap Agreement I – never making a single payment to SMIL between January 6, 2017 (five days following the first Valuation Date) and December 8, 2017 or otherwise in connection with Swap Agreement I.

29. In connection with Swap Agreement II, MSJJ Trust was required to pay the Equity Amounts five business days after each calendar month following the December 20, 2017 trade date, through and including the termination date of December 21, 2018. MSJJ Trust failed to do so – breaching Swap Agreement II – never making a single payment to SMIL between January 5, 2018 (five days following the first Valuation Date) and the present date or otherwise in connection with Swap Agreement II.

30. Upon information and belief, MSJJ Trust earned positive returns with respect to its investment of the Total Premium and booked substantial profits and received millions of dollars in its account – the specific amounts of these returns, profits and dollars currently are

unknown to Mr. Simpson, who has not been provided with any account documentation. MSJJ Trust could not have done so but for the payment of the Premium Amount by SMIL and Mr. Simpson under the Swap Agreements. MSJJ Trust, however, has refused to pay the Equity Amounts owed to Mr. Simpson (any of them), which represents a breach of Sections 2(a)(i) and 5(a)(i) of Swap Agreements I and II.

31. During the period between December 2017 and April 2018, in order to forestall action by Mr. Simpson, Mr. Tew repeatedly misrepresented the status of supposed payments made to MSJJ in connection with its investments, stating that money had been received in various accounts in Kentucky and elsewhere when in fact no such payments had been received.

32. In light of MSJJ Trust's continuing events of default, Mr. Simpson, individually and as successor-in-interest to SMIL, announced by notice dated August 10, 2018, that they were terminating the Swap Agreements and designating August 14, 2018 as the Early Valuation Date. In accordance with the Swap Agreements, MSJJ Trust is required to pay not only the overdue Equity Amounts, but the Premium Repayment Amount as of the Early Valuation Date. Master Agreements I and II, at § 6(a) and (e)(i). Mr. Simpson, in his dual capacity, consequently requested that MSJJ Trust immediately forward the outstanding monies owed to Mr. Simpson, plus interest and contractual attorneys' fees. *See* Plaintiff's Notice and Calculation Statement dated August 10, 2018. MSJJ Trust failed to do so.

33. By subsequent letter dated August 16, 2018, counsel for Mr. Simpson, individually and on behalf of SMIL, wrote MSJJ Trust and reiterated that "you were obligated to settle certain swap obligations as of August 14, 2018" and "[y]ou … failed to make the payments due…. [I]f you do not fully satisfy your obligations to the Simpson Parties by Tuesday, August 21, 2018, we will have no alternative but to bring an action against you in New York to recover

the amounts owed (together with legal fees and disbursements incurred) without further notice to you." *See* Plaintiff's Letter dated August 16, 2018.

34. To date, MSJJ Trust has failed to pay any amounts owed to Mr. Simpson, individually and as successor-in-interest to SMIL, in connection with the Premium Repayment Amount, the Equity Amounts and other monies, fees and payments, all in violation of the terms of Swap Agreements I and II.

### FIRST CAUSE OF ACTION – BREACH OF CONTRACT
(Swap Agreement I)

35. Mr. Simpson repeats and realleges the allegations contained in paragraphs 1 through 34 above as if fully set forth herein.

36. MSJJ Trust has breached its express and implied obligations owed to Mr. Simpson as successor-in-interest to SMIL, and/or as assignee with respect to SMIL's rights under Swap Agreement I, by failing to pay the Equity Amounts in accordance with Swap Agreement I.

37. Mr. Simpson is entitled to contractual interest on the Equity Amounts "before as well as after judgment," for "the period from (and including) such Early Termination Date to (but excluding) the date the amount is paid, at "a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund ... the relevant amount plus 1% per annum." Master Agreement I, at § 9(h)(ii)(2) and at 21, 24 (definitions of "Applicable Close-out Rate" and "Default Rate"). MSJJ Trust has breached its obligations owed to Mr. Simpson by failing to pay interest owed in accordance with Swap Agreement I.

38. Mr. Simpson is entitled to attorneys' fees and other expenses and costs of collection in this matter under Swap Agreement I, which provides that "A Defaulting Party will,

on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, ... incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection." Master Agreement I, at § 11. MSJJ Trust has breached its obligations owed to Mr. Simpson by failing to pay any and all reasonable out-of-pocket expenses, including legal fees, and other expenses and costs of collection, owed in connection with this litigation and Mr. Simpson's enforcement of Swap Agreement I.

39. Pursuant to Swap Agreement I, Mr. Simpson is entitled to $600,000 as of the Early Termination Date, representing the unpaid Equity Amounts between January 6, 2017 and December 8, 2017 or otherwise, owed in connection with MSJJ Trust's breach of Swap Agreement I (20% of the $3 million Total Premium). Mr. Tew, MSJJ Trust's principal (indirect) beneficiary, even admitted in an email dated December 12, 2017, sent to Mr. Simpson, that "The MSJJ Retirement Group Trust transacted a total return swap with Simpson Master Investment Limited on December 9, 2016 for a premium of $3,000,000 USD. The total value of that investment is now $3,600,000 USD. MSJJ Retirement Group Trust will pay to Simpson Master Limited a single payment of $600,000.00 USD as soon as possible before the end of business on December 20, 2017" (emphasis added). MSJJ Trust has not paid any of the foregoing Equity Amounts, nor has it paid any contractual interest or reasonable out-of-pocket expenses, legal fees, and other expenses and costs of collection owed by MSJJ Trust.

40. By reason of the foregoing, in connection with Swap Agreement I, Mr. Simpson has been damaged and is entitled to recover from MSJJ Trust the unpaid Equity Amounts in an amount equal to $600,000, plus accruing contractual interest and reasonable out-of-pocket expenses, legal fees, and other expenses and costs of collection.

## SECOND CAUSE OF ACTION – BREACH OF CONTRACT
(Swap Agreement II)

41. Mr. Simpson repeats and realleges the allegations contained in paragraphs 1 through 40 above as if fully set forth herein.

42. MSJJ Trust has breached its express and implied obligations owed to Mr. Simpson by failing to pay the Equity Amounts and the Premium Repayment Amount in accordance with Swap Agreement II.

43. Mr. Simpson is entitled to contractual interest on the Equity Amounts and the Premium Repayment Amount, "before as well as after judgment," for "the period from (and including) such Early Termination Date to (but excluding) the date the amount is paid, at "a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund … the relevant amount plus 1% per annum." Master Agreement II, at § 9(h)(ii)(2) and at 21, 24 (definitions of "Applicable Close-out Rate" and "Default Rate"). MSJJ Trust has breached its obligations to Mr. Simpson by failing to pay interest owed in accordance with Swap Agreement II.

44. Mr. Simpson is entitled to attorneys' fees and other expenses and costs of collection in this matter under Swap Agreement II, which provides that "A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, … incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection." Master Agreement II, at § 11. MSJJ Trust has breached its obligations to Mr. Simpson by failing to pay any and all reasonable out-of-pocket

expenses, including legal fees, and other expenses and costs of collection, owed in connection with this litigation and Mr. Simpson's enforcement of Swap Agreement II.

45. Pursuant to Swap Agreement II and in addition to the monies owed to Mr. Simpson under Swap Agreement I, Mr. Simpson is entitled to no less than $3.3 million as of the Early Termination Date, representing (i) at least approximately $300,000 in unpaid Equity Amounts between January 5, 2018 and the present date or otherwise (at least 10% of the $3 million Total Premium, although the figure may be higher), owed to Mr. Simpson in connection with MSJJ Trust's breach of Swap Agreement II; and (ii) the Premium Repayment Amount of $3 million owed to Mr. Simpson in connection with MSJJ Trust's breach of Swap Agreement II. MSJJ Trust has not paid any of the foregoing Equity Amounts and/or Premium Repayment Amount, nor has it paid any contractual interest or reasonable out-of-pocket expenses, legal fees, and other expenses and costs of collection owed by MSJJ Trust.

46. By reason of the foregoing, in connection with Swap Agreement II, Mr. Simpson has been damaged and is entitled to recover from MSJJ Trust the unpaid Equity Amounts and the Premium Repayment Amount in an amount to be determined but in no event less than $3.3 million, plus accruing contractual interest and reasonable out-of-pocket expenses, legal fees, and other expenses and costs of collection.

**WHEREFORE,** plaintiff Robert Simpson, individually and as the successor-in-interest to SMIL and/or as the assignee with respect to SMIL's swap-related rights, demands judgment against defendant Melissa Gayheart as trustee of MSJJ Retirement Group Trust as follows: (i) under the first cause of action, for damages equal to the unpaid Equity Amounts owed under Swap Agreement I, in an amount equal to $600,000, plus accruing contractual interest and reasonable out-of-pocket expenses, legal fees, and other expenses and costs of collection; (ii) under the second cause of action, for damages equal to the unpaid Equity Amounts and the

Premium Repayment Amount owed under Swap Agreement II, in an amount to be determined but in no event less than $3.3 million, plus accruing contractual interest and reasonable out-of-pocket expenses, legal fees, and other expenses and costs of collection; and (iii) for the costs and disbursements incurred by Mr. Simpson in this matter and for such other and further relief as may be just and proper.

Dated: September 21, 2018

        **KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.**

By: _____*Marc Rosen*_____
           Marc R. Rosen
           Joshua K. Bromberg

551 Fifth Avenue, 18th Floor
New York, New York 10176
Telephone: (212) 986-6000
Facsimile: (212) 986-8866
Email: MRosen@kkwc.com

Attorneys for Plaintiff
***ROBERT SIMPSON, individually and successor-in-interest to Simpson Master Investments Limited***